USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2276 ALLENS MANUFACTURING COMPANY, INC., Plaintiff, Appellant, v. NAPCO, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ ____________________ Before Breyer, Chief Judge, ___________ Friedman,* Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Michael J. McGovern with whom Indeglia & McGovern was on brief ____________________ ____________________ for appellant. Mark A. Pogue with whom Deming E. Sherman and Edwards & Angell ______________ _________________ _________________ were on brief for appellee. ____________________ August 25, 1993 ____________________ _____________________ *Of the Federal Circuit, sitting by designation. BREYER, Chief Judge. Allens Manufacturing Co. ____________ brought this diversity action against Napco, Inc., claiming that Napco failed to provide it with proper "clean up" equipment, as promised, and on time. Allens adds that this failure is responsible for a significant part of a $210,000 fine that Allens has agreed to pay the Environmental Protection Agency ("EPA"). After listening to Allens' proposed evidence about damages -- evidence designed to show for what portion of the fine Napco was responsible -- the ____________ district court ruled that Allens' evidence was not sufficient to pinpoint Napco-caused damages with "reasonable certainty." It then granted Napco's motion to exclude evidence of the fine, at which point the parties agreed that the court should dismiss the complaint for failure to allege the jurisdictionally-necessary $50,000 harm. 28 U.S.C. 1332(a). Allens, having reserved the right to appeal, does so. It asks us to review the court's evidentiary ruling. We find the ruling lawful, and affirm the court's judgment. I Background __________ Our review of the rather skimpy record before us on appeal suggests the following: Allens makes metal belt buckles, shoe buckles, and other items, through processes -2- 2 that generate waste water containing pollutants. In February 1985 Allens ordered from Napco a waste water treatment system that Napco installed during 1985, and which began to operate in early 1986. In the meantime, Allens apparently violated federal environmental rules and regulations, some governing waste water discharges and others setting forth reporting requirements. The record suggests that by 1989, EPA had compiled a list of one hundred or more separate violations committed by Allens, which took place in more than fifty different months, between September 1981 and June 1989. EPA apparently contemplated possible fines for these violations amounting to $384,000. Allens' counsel then wrote to EPA, pointing out that Allens had "acted in good faith," was not "recalcitrant," and had "cooperated with . . . authorities to achieve compliance as expeditiously as possible." He suggested a "penalty . . . in the $50,000 to $65,000 range." EPA offered to settle with Allens for a fine of $125,000, but Allens refused. EPA then referred the matter to the Department of Justice ("DOJ"). DOJ insisted on considerably more than $125,000. Allens and DOJ ultimately entered into a consent -3- 3 decree, in which, as we have said, Allens agreed to pay a fine of $210,000. Subsequently, Allens filed this lawsuit, claiming that Napco failed to live up to its promises to install clean-up equipment, and seeking reimbursement for the fine (and related costs) insofar as the fine reflects "discharge" violations taking place after September 1985 (by which time, according to Allens, Napco should have had proper equipment operating). Before the case went to trial, Napco told the court that Allens could not show with reasonable certainty how much of the fine resulted from Napco's claimed failings. Without some such showing, Napco argued, the $210,000 fine figure was misleading and prejudicial. And, it asked the court to keep evidence of that figure from the jury. The court itself then heard Allens' evidence on the matter (consisting of several EPA documents and the testimony of an expert). It agreed with Napco that this evidence failed to prove damages with "reasonable certainty," and it granted Napco's evidentiary motion. Then, the parties having agreed that, given the evidentiary ruling, Allens could not prove significant harm, the court dismissed the complaint for failure to set forth a "matter in controversy exceed[ing] -4- 4 the sum or value of $50,000." 28 U.S.C. 1332(a). See ___ Gibbs v. Buck, 307 U.S. 66, 72 (1939) (plaintiff's good _____ ____ faith allegation that the matter in controversy exceeds the jurisdictional amount requirement suffices to meet the amount in controversy test, unless challenged); Dept. of _________________ ________ Recreation & Sports v. World Boxing Ass'n, 942 F.2d 84, 88 ___________________ __________________ (1st Cir. 1991) (citing Gibbs, 307 U.S. at 72) (once _____ jurisdictional amount is challenged, plaintiff must show facts sufficient to show that it is not a "legal certainty" that the claim involves less than the jurisdictional ____ amount). See also 14A Wright, Miller & Cooper Federal _________ _______ Practice and Procedure 3702 at 26-28 (favoring policy of ______________________ according trial judges broad discretion as to the mode of determining jurisdictional fact issues). Allens appeals. Allens argues only that its proposed evidence is sufficient to prove damages with the requisite degree of certainty. We have examined that single claim. We conclude that the district court's determination of that evidentiary matter is legally correct. And, as neither party raises any other objection, we affirm the complaint's dismissal. -5- 5 II The Evidence ____________ Allens, in its effort to show that Napco was responsible for some reasonably identifiable portion of the $210,000 fine, presented two EPA documents and the testimony of one expert. The first document quantifies the economic "benefit" that Allens obtained as a result of its failure to follow EPA rules and standards. The second EPA document, called a "gravity calculation," lists individually each of 56 months, refers to Allens' violations during that month, and sets forth a possible fine for each month, the amount of which varies with the number of violations during that month, their duration, their significance, and the harm they may have caused. The "benefit" amounted to about $94,000. The "gravity calculation" totalled $290,000. Their sum is approximately $384,000. The expert, a former EPA lawyer, interpreted these documents in light of EPA's "Policy on Civil Penalties," reprinted in 17 ELR 35,083 (Feb. 16, 1984), and his own _____________ experience at EPA. He apparently conceded that the first document (showing a "benefit" to Allens of $94,000) had little to do with Napco-related violations. He analyzed the second document -- the "gravity calculation" -- month by -6- 6 month. He added together all penalties for any month (after September 1985) that referred only to discharge violations. He allocated penalties in any (post-September 1985) month that showed both "discharge" and "reporting" violations, between those two categories. He then added up the total. He found that, of the "gravity calculation"'s $290,000 total, approximately $190,000 reflected "discharge violations" occurring after September 1985. He concluded that Napco-related violations amounted to $190,000, or about half, of the two documents' $394,000 total. The expert recognized that the final fine was not $394,000; rather, it was $210,000. He said, however, that since Napco-related violations accounted for about half the two documents' $394,000, they likely accounted for half the final $210,000 fine. That is because, in his view, adjustments to the $394,000 figure likely reflected similar treatment of both Napco-related and non-Napco-related violations. That is to say (in the words of Allens' brief), "a reduction of the original fine calculation no more altered the ratio of discharge to reporting violations than removing a slice of mince meat pie would alter the ratio of apples to raisins in the remaining pie." -7- 7 III The Problem with the Evidence _____________________________ The basic problem with this evidence lies in the fact that the EPA did not fine Allens a hypothetical $394,000. Rather, it proposed a fine of $125,000. Then DOJ, after consulting with EPA, ended up imposing a fine of $210,000. The record does not explain how the EPA or DOJ arrived at these latter, actual, fine amounts. Indeed, the record offers no more support for the pro rata (or "mince _________ meat pie") theory than it offers for other, equally plausible (and equally speculative) theories that would produce dramatically different results. We concede that, in the absence of any evidence about what actually happened, one might believe, as the expert suggested, that the proposed $125,000 fine simply reflected the fact that EPA's independent authority to negotiate a settlement has a $125,000 ceiling, 40 CFR 122.41(a)(3), and that EPA reduced all the elements of the $394,000 calculation pro rata in order to reach this _________ ceiling. On the other hand, it is at least as likely that EPA, in reaching the $125,000 figure, attached different degrees of significance to different elements of the $394,000 calculation. EPA's Policy on Civil Penalties -8- 8 states that EPA will adjust initially calculated ("benefits" plus "gravity") fine amounts, in light of such factors as (1) the violator's history of cooperation or recalcitrance, as "indicated through pre-settlement action," (2) whether actions were negligent or wilful, and (3) the violator's ability to pay. See 17 ELR 35,083. And here, Allens could ___ make (and Allens' counsel did make) strong arguments to EPA that Allens' discharge violations were unintended and minor _________ (not "exceed[ing] the effluent limitations by any significant degree"). If EPA accepted these arguments, it might have proved more willing to forgive the discharge violations than the reporting violations for which Allens offered no excuse. Or, even if it did not accept these arguments, EPA might have placed more weight on forfeiting "benefits" than on a calculation of "gravity." Similarly, EPA and DOJ might have arrived at the final $210,000 figure by increasing pro rata a $125,000 _________ figure (or reducing pro rata the initial $384,000). But it ________ is just as plausible, if not more plausible, to believe that they arrived at that figure in light of Allens' lack of cooperation, or "recalcitrance" as revealed in "pre- settlement action," and potentially increased litigation costs for the government. And, these factors may have had -9- 9 nothing to do with discharge violations after September 1985. The upshot is that we do not know what actually led EPA and DOJ to end up with a fine of $210,000. Moreover, this uncertainty reflects, not closely-balanced evidence, but a lack of evidence, for the record contains no ____ evidence about what actually happened, nor does it set forth evidence of any agency rule, pattern, or practice indicating that pro rata reduction or increase is the norm. The result ________ is that we can only speculate about the extent to which EPA's "mitigating" or "aggravating" factors may have applied in respect to each of the many (1981 through 1989) violations that initially called for a fine, and about the extent to which those factors may have played a role in determining the ultimate fine level. More importantly, the expert could do no more than speculate, for he had no personal knowledge about how EPA calculated the ultimate fine, nor did he have any special reason for believing that these factors applied pro rata to every element identified ________ in the "benefit" and "gravity" calculations. Finally, the experienced trial judge decided that the jury, too, would have to speculate in order to determine the level of damages. And, for the reasons stated, we agree with his -10- 10 conclusion -- that the plaintiff's evidence does not identify those damages with the "reasonable certainty" that the law requires. See National Chain Co. v. Campbell, 487 ___ ___________________ ________ A.2d 132, 134-5 (R.I. 1985) (damages must be established "with reasonable degree of certainty" and plaintiff "cannot rely upon speculation" in order to prove his damages); Restatement (Second) of Contracts 352 (1981) ("Damages are _________________________________ not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty"). Allens raises one final point. It says that the district court should not have insisted that it demonstrate damages to a "reasonable certainty," for in doing so, it permits Napco to benefit from uncertainty caused by Napco's own conduct. See Eastman Kodak Co. v. Southern Photo ___ ___________________ _______________ Materials Co., 273 U.S. 359, 379 (1927) ("[A] defendant ______________ whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible"); U.C. Castings Co. v. Knight, 754 __________________ ______ F.2d 1363, 1374 (7th Cir. 1985) (same). The short, conclusive answer to this claim is that Napco's conduct did not create, nor can one expect Napco to have foreseen, the -11- 11 present problem. Rather, Allens has found it difficult to prove damages because EPA will not permit its officials to testify, 40 C.F.R. 2.403, 2.404(a), and Allens did not insist that EPA publicly explain (perhaps in the decree itself) the basis for calculating the fine. Napco is not responsible. In sum, the district court properly found that Allens' proposed evidence about damages failed to demonstrate damages to a reasonable degree of certainty. That being so, the court could properly exclude evidence of the $210,000 fine (presumably on grounds of "prejudice" overcoming "relevance," see Fed. R. Evid. 403). And the ___ parties, in effect, agree that, without the evidence, the district court could dismiss the complaint for failure properly to meet the $50,000 jurisdictional requirement. For these reasons, the judgment of the district court is Affirmed. ________ -12- 12